## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **KAREN BILLIG**<br>5004 Davenport St. #11<br>Omaha, NE  68132<br><br>**Individually and on Behalf of All Others Similarly Situated,**<br><br>      **Plaintiff**<br><br>vs.<br><br>**COVENTRY HEALTH CARE, INC.**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**DALE B. WOLF**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**DANIEL N. MENDELSON**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**RODMAN W. MOORHEAD, III**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**TIMOTHY T. WEGLICKI**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**L. DALE. CRANDALL**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**ELIZABETH E. TALLETT**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817<br><br>**ALLEN F. WISE**<br>6705 Rockledge Drive, Suite 900<br>Bethesda, Maryland 20817 | Civil Action No: _____<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF ERISA** |

**JOEL ACKERMAN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**LAWRENCE N. KUGELMAN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**SHAWN M. GUERTIN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**PATRISHA DAVIS**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**JOHN RUHLMANN**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**COVENTRY 401(k) PLAN INVESTMENT
COMMITTEE**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

And

**JOHN DOES 1-10**
6705 Rockledge Drive, Suite 900
Bethesda, Maryland 20817

**Defendants**

## CLASS ACTION COMPLAINT

Plaintiff, Karen Billig ("Plaintiff"), an employee of Defendant Coventry Health Care, Inc. ("Coventry" or the "Company") and a participant in and beneficiary of the Coventry Health Care, Inc. Retirement Savings Plan (the "Plan"), on behalf of herself and all other participants in and beneficiaries of the Plan during the Class Period, *i.e.*, between February 9, 2007 and the present, and whose accounts included investments in Coventry common stock (the "Class"),

#1236183v.1                                    2

alleges the following based upon personal knowledge as to the facts pertaining to herself and based upon an investigation by Plaintiff's counsel, which included a review of United States Security and Exchange Commission ("SEC") filings by Coventry and the Plan, including the Company's annual and quarterly reports, the Annual Reports filed on behalf of the Plan ("Form 11-K"), a review of press releases and other public statements by the Company and Defendants, as well as third-party media and analyst reports, available documents governing the operations of the Plan, and on information and belief as to all other facts:

## NATURE OF THE ACTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act, as amended ("ERISA"), 29 U.S.C. §1132, against fiduciaries of the Plan who are and were responsible for the investment of the Plan's assets and its administration.  As alleged herein, the Plan fiduciaries breached their fiduciary duties – duties they owed to Plan participants – causing the loss of millions of dollars of Plan participants' retirement savings.

2.      This action is brought on behalf of the Plan and seeks recovery for losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).   In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other monetary relief.

3.      Plaintiff was an employee of Coventry and was, and is, a participant in and beneficiary of the Plan.  As a participant in the Plan, Plaintiff was entitled to set aside a certain percentage of her annual base salary for investment of those funds through the Plan.  Among the investment options available to Plan participants was investment in Coventry common stock

("Coventry Stock" or "Company Stock").  Defendants encouraged Plan participants to acquire

and hold as many shares of Coventry Stock as possible in their retirement savings accounts.

## JURISDICTION AND VENUE

4.     **Subject Matter Jurisdiction**.  Pursuant to ERISA § 502(e)(1), 29 U.S.C. §

1132(e)(1), this Court has original, exclusive subject matter jurisdiction over this civil

enforcement action for breach of fiduciary duty under ERISA.  Additionally, 28 U.S.C. § 1331

provides this Court with general subject matter jurisdiction.

5.     **Personal Jurisdiction**.  ERISA provides for nation-wide service of process.

ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  Because Defendants are either residents of the

United States or subject to service in the United States, this Court has personal jurisdiction over

them.  Furthermore, because all Defendants would be subject to the jurisdiction of a court of

general jurisdiction in this District, this Court also has personal jurisdiction over Defendants

pursuant to FED. R. CIV. P. 4(k)(1)(A).

6.     **Venue**.  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because the Plan was administered in this District, some or all of the fiduciary

breaches for which relief is sought occurred in this District, and because some or all of

Defendants reside or maintain their primary place of business in this District.

## PARTIES

**A.     Plaintiff**

7.     **Plaintiff Karen Billig** is a resident of Douglas County, Nebraska.  She was and

continues to be a participant in the Plan within the meaning of ERISA §§ 3(7) and 502(a), 29

U.S.C. §§ 1002(7) and 1132(a). During the Class Period, Coventry Stock was purchased or

maintained on Plaintiff's behalf by means of the Plan in the Company Common Stock Fund.

**B.**     **Defendants**

### The Company

8.     Defendant Coventry Health Care, Inc. is a national managed health care company that operates health plans, insurance companies, network rental and managed care service companies and workers' compensation companies. At all relevant times, Coventry was a public company and Coventry Stock traded on the New York Stock Exchange under the ticker "CVH." Coventry is a Delaware corporation with its principal executive offices located at 6705 Rockledge Drive, Suite 900, Bethesda, Maryland 20817.

9.     Coventry was at all relevant times the Plan sponsor and administrator and exercised discretionary authority – acting through its officers, directors and employees, including, but not limited to, members of the Company's 401(k) Plan Investment Committee (the "Investment Committee"), who were appointed to perform fiduciary functions – with respect to management and administration of the Plan and/or management and disposition of Plan assets.

10.     During the Class Period, Coventry had effective control over the activities of its officers, directors and employees, including their Plan-related activities. Through its officers, directors and employees, Coventry had the authority and discretion to hire and to terminate its officers, directors, and employees who were responsible for the management and administration of the Plan.

11.     Through its officers, directors and employees, Coventry also had the authority and discretion to appoint, monitor, and remove officers and employees from their individual fiduciary roles with respect to the Plan, including members of the Investment Committee. By failing properly to discharge their fiduciary duties under ERISA, the Defendants named herein breached the duties they owed to Plaintiff and members of the Class. Under the doctrine of

*respondeat superior*, the actions of the Company's officers, directors and employees are imputed to Coventry and Coventry is liable for their actions.

**Director Defendants**

12.     **Defendant Dale B. Wolf** ("Wolf") was, at all relevant times, Coventry's Chief Executive Officer ("CEO") and Director.   During the Class Period, Defendant Wolf was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

13.     **Defendant Daniel N. Mendelson** ("Mendelson") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Mendelson was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

14.     **Defendant Rodman W. Moorhead, III** ("Moorhead") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Moorhead was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

15.     **Defendant Timothy R. Weglicki** ("Weglicki") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Weglicki was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

16.     **Defendant L. Dale Crandall** ("Crandall") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Crandall was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

17.     **Defendant Elizabeth E. Tallett** ("Tallett") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Tallett was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

18.     **Defendant Allen F. Wise** ("Wise") was, at all relevant times, a Director of the Company.  During the Class Period, Defendant Wise was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed

discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

19.    **Defendant Joel Ackerman** ("Ackerman") was, at all relevant times, a Director of the Company.    During the Class Period, Defendant Ackerman was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

20.    **Defendant Lawrence N. Kugelman** ("Kugelman") was, at all relevant times, a Director of the Company.    During the Class Period, Defendant Kugelman was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

21.    Defendants Wolf, Mendelson, Moorhead, Weglicki, Crandall, Tallett, Wise, Ackerman, and Kugelman are hereinafter referred to as "Director Defendants."

22.    In addition to their other Plan-related duties and responsibilities, the Director Defendants were responsible for appointing members of the Investment Committee.    *See* Coventry Form 11-K, dated June 29, 2009, for the fiscal plan year ended December 31, 2008 (the "2008 Form 11-K") at 5.

### Investment Committee Defendants

23.    **Defendant Investment Committee**, at all relevant times, managed and administered the Plan and the Plan assets and acted as a fiduciary with respect to the Plan.

During the Class Period, the Investment Committee and its members were fiduciaries of the Plan within the meaning of ERISA because they exercised discretionary authority and discretionary control with regard to the Plan's management, administration, investments and assets.

24.     Upon information and belief, the Investment Committee was at all relevant times comprised of officers, directors or employees of Coventry, who were responsible for designating investments funds for the Plan, establishing rules and procedures with respect to the Plan's investment funds and monitoring the performance of the Plan's investments.  The Investment Committee members were appointed by the Board of Directors.

### Plan Administrator Defendants

25.     **Defendant Shawn M. Guertin** ("Guertin") was, at all relevant times, a Plan Administrator and signed to Coventry's Forms 11-K submitted to the SEC.  During the Class Period, Defendant Guertin was also Coventry's Executive Vice President, Chief Financial Officer ("CFO") and Treasurer.  Defendant Guertin was fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

26.     **Defendant Patrisha Davis** ("Davis") was, at all relevant times, a Plan Administrator and signed Coventry's Forms 11-K submitted to the SEC.  During the Class Period, Defendant Davis signed relevant Plan filings with the SEC.  Defendant Davis was fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the

9

administration of the Plan and exercised authority or control with respect to the management of Plan assets.

27.     **Defendant John J. Ruhlmann** ("Ruhlmann") was, at all relevant times, Coventry's Senior Vice President and Corporate Controller.   Defendant Ruhlmann was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan and exercised authority or control with respect to the management of Plan assets.

### John Doe Defendants

28.     Defendants John Doe 1-10 are additional Coventry officers, directors, employees, members of the Investment Committee and/or any other committees who were fiduciaries of the Plan during the Class Period and whose identities are presently unknown to Plaintiff.  Once their identities are ascertained, Plaintiff will seek leave to join them under their names.

### THE PLAN

29.     The Plan is a legal entity than can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, in a breach of fiduciary action such as this, the Plan is neither a plaintiff nor defendant.  Rather, Plaintiff seeks plan-wide relief for the benefit of the Plan.

30.     The Plan covers eligible employees of Coventry and its subsidiaries.

31.     The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) and "defined contribution plan" or "individual account plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for

individual accounts for each participant and for benefits based solely upon the amount contributed to the participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participants' accounts. As a result, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

32.     The Plan is a voluntary contribution plan in which participants make contributions to the Plan and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to participants' individual accounts.

33.     According to Coventry's 2008 Form 11-K at 5, Plan participants may generally contribute an amount up to 75% of their compensation on a pretax basis to the Plan. The Company matches 100% of each Plan participant's contribution up to a maximum 3% of compensation, and 50% of each participant's contribution in excess of 3% up to a maximum of 6% of compensation considered, for a maximum matching contribution of 4.5% of eligible Plan compensation. The Company's matching contributions are made in shares of Company Stock.

34.     According to the Plan's specific terms, the Coventry Common Stock Fund, comprised of Company Stock, is the principle common stock investment option under the Plan. According to the 2008 Form 11-K (at 8), the Plan held $49,895,466 worth of Company Stock during the 2008 Plan fiscal year.

35.     Upon information and belief, Coventry's SEC filings were incorporated into the Company's Summary Plan Description ("SPD"), including, but not limited to Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K and Registration Statements, rendering communications contained in such SEC filings fiduciary communications with Plan participants.

**A.    Defendants' Fiduciary Status**

36.    **Named Fiduciaries**.    Pursuant to ERISA 402 § 402(a)(1), 29 U.S.C. § 1002(21)(A), every plan must provide for one or more named fiduciaries of the Plan.    The individual named as the "administrator" in the plan instrument is automatically a named fiduciary, and in absence of such a designation, the sponsor serves as administrator.    ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

37.    **De Facto Fiduciaries**.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who, in fact, perform fiduciary functions.    Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."    ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

38.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the Plan's participants under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

39.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, as well as the Plan's investments, solely in the interest of the Plan's participants and beneficiaries.    As fiduciaries, Defendants were required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of

an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

40.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

41.     ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all fiduciaries of the Plan were obliged, when wearing their fiduciary hat(s) to act independently of Coventry which had no authority under the governing Plan's documents to direct the conduct of any of them with respect to the Plan, investments therein, or the disclosure of information between and among fiduciaries or from fiduciaries to the participants.

## DEFENDANTS' FIDUCIARY ROLES

**A.     Defendant Coventry**

42.     Upon information and belief, under the terms of the Plan, Coventry, through its officers, directors and employees, including members of the Investment Committee, had direct control and management over all aspects of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries under the Plan and upon information and belief, exercised this control.

43.     As a matter of corporate law, Coventry is imputed with the knowledge that its officers and employees had of the misconduct alleged herein, even if not communicated to the Company.

44.     Coventry exercised responsibility for communicating with participants regarding the Plan and providing participants with information and materials required by ERISA.  In this regard, Coventry drafted and disseminated various documents and materials related to the Plan, including but not limited to, an SPD and the documents incorporated into the SPD.  Based on the allegations contained herein, Coventry is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets and exercised discretionary authority or control with respect to the appointment of other Plan fiduciaries.

**B.     Director Defendants**

45.     The Director Defendants are the Plan's fiduciaries to the extent they exercised their authority to select, monitor, retain and remove Plan fiduciaries, including members of the Investment Committee and exercised authority and oversight over such fiduciaries, including members of the Investment Committee, who reported to the Board of Directors regarding the Investment Committee's fiduciary duties and responsibilities to the Plan and with respect to their actions pertaining to the same.

**C.     Investment Committee Defendants**

46.     Defendant Investment Committee is responsible for directing and coordinating all activity relating to the management of investment assets of the Plan.  In discharging these duties,

the Investment Committee has the authority and discretion to add and eliminate investment options.

47.    In their capacity to select and monitor investment options for the Plan, the Investment Committee had the discretion and authority to suspend, eliminate or reduce any Plan investment, including investments in Coventry Stock.   Upon information and belief, the Investment Committee regularly exercised its authority to suspend, eliminate, refuse or restructure the Plan's investments.   The Investment Committee also reported to the Board of Directors regarding these duties and the Plan's events pertaining to investment restructuring.

48.    The Investment Committee also exercised responsibility for communicating with Plan participants regarding the Plan and providing Plan participants with information and materials required by ERISA.   In this regard, on behalf of the Company and Director Defendants, the Investment Committee disseminated the Plan's documents and materials.

49.    The Investment Committee was a fiduciary of the Plan during the Class Period because it exercised discretionary authority with respect to the management of the Plan and/or the management and disposition of the Plan's assets.

**D.     Plan Administrator Defendants**

50.    Upon information and belief, during the Class Period, Defendants Guertin, Davis and Ruhlmann, the Plan Administrators, were charged with administrative responsibilities pertaining to the Plan and did in fact exercise those responsibilities.   Upon information and belief, the Investment Committee may delegate to the Plan Administrators the responsibility of administering and operating the details of the Plan in accordance with the provisions of the Plan and any policies that may from time to time be established by the Investment Committee.   The Plan Administrators have full discretionary authority to determine all questions and to make all

factual determinations regarding any and all matters arising in the administration, interpretation and application of the Plan. During the Class Period, Plan Administrator Defendants were fiduciaries of the Plan in that they exercised discretionary authority with respect to the management of the Plan and/or the management and disposition of Plan assets.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action, pursuant to Rule 23(a), (b)(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of herself and all others similarly situated who were participants in or beneficiaries of the Plan between February 9, 2007 through and including the present and whose accounts held Coventry Stock.

52.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, several thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact commons to the Class are:

(a)     Whether Defendants each owed a fiduciary duty to Plaintiff and the Class;

(b)     Whether Defendants breached their fiduciary duties to Plaintiff and the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)     Whether Defendants violated ERISA; and

(d)     Whether Plaintiff and members of the Class have sustained damages and, if so, what is the appropriate measure thereof.

54.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and Class members each sustained damages arising from Defendants' wrongful conduct in violation of ERISA.

55.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and complex litigation under federal law.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

56.     Class action status in this ERISA action is warranted under FED. R. CIV. P. 23(b) because prosecution of separate actions by individual members of the Class would create the risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

57.     Class action status is also warranted under the other subsections the other sections of FED. R. CIV. P. 23(b) because:

(a)     Prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants;

(b)     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole; and

(c)     Questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**A.     Defendants Breached Their Fiduciary Duty Of Prudence By Investing In Coventry Stock**

**(i)     Background**

58.     Defendant Coventry Health Care, Inc. is a national managed health care company that operates health plans, insurance companies, network rental and managed care service companies and workers' compensation companies.  Coventry offers risk and fee-based managed care products and services to individuals, employer and government-funded groups, government agencies, and other insurance carriers and administrators.  The Company maintains numerous divisions, including: (1) Commercial Business division; (2) Individual Consumer & Government Business division; and (3) Specialty Business division.  The Company utilizes a network of independent brokers in addition to its direct sales staff.

59.     Through Coventry's Commercial Business division, the Company offers its health maintenance organization ("HMO"), preferred provider organizations ("PPO"), and point of service products.  This division also offers commercial management services products and consumer-directed benefit options, including health reimbursement accounts and health savings accounts.

60.     Through Coventry's Individual Consumer and Government division, the Company offers health benefits to members participating in the Medicare Advantage HMO, Medicare Advantage PPO, Medicare Advantage Private-Fee-For-Service, Medicare Prescription Drug, and Medicaid programs.

61.     In 2006, Coventry introduced a Medicare Private-Fee-For-Service ("PFFS") initiative, "Advantra Freedom," which the Company intended to serve as a key tool for growth

for the Company. Coventry's PFFS initiative was a part of the Individual Consumer & Government division.

62. To obtain new members and to convince Coventry shareholders and Plan participants of the PFFS initiative's viability, the Company intentionally under-priced the Advantra Freedom product. As a result, Coventry's PFFS program conveyed illusory gains and rapidly drew customers and market share at the expense of actual profitability.

63. The Company's under-pricing scheme reflected an inaccurate "medical loss ratio" ("MLR"), the ratio of expenses of providing healthcare services. Simply put, when a company operates with a low MLR, this means that the company is expending less revenue paying health care claims and thus recognizing greater profits. As a result, companies touting low MLRs trade their stock at higher prices.

### (ii) Defendants' Materially And Incomplete Information Disseminated To Plan Participants

64. During the Class Period, Defendants regularly disseminated materially incomplete and inaccurate information regarding the Company's financial condition.

65. During 2007, Defendants disseminated numerous materially misleading statements and omissions which neglected to disclose the Company's under-pricing strategies related to the new PFFS initiative. Specifically, the Company failed to disclose that it was intentionally under-pricing its Advantra Freedom product to draw customers and convey a false appearance of rapid growth of the PFFS product. Further, the Company issued numerous positive statements regarding Coventry's financial condition that were false and materially misleading.

66. On February 9, 2007, Coventry issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2006. In that announcement,

Coventry stated that it was raising its 2007 Medicare PFFS membership growth expectations by 65% to 90,000-100,000 members. On a conference call with investors that same day, Defendant Wolf confirmed those numbers, stating that Coventry expected "somewhere between 90,000 and 100,000 members by year-end." Additionally, Defendant Guertin stated that Coventry's "newest growth initiative, Medicare Private-Fee-For-Service, is off to a roaring start" and "exceeding [Defendants'] expectations. . . in terms of the total membership and how quickly it is coming on board." Defendant Guertin reiterated that the Company was raising its guidance on the PFFS initiative from 50,00-65,000 members by year-end and expected revenue of $500 million to 90,000-100,000 members by year-end and expected revenues of $700 million.

67.    During the February 9, 2007 conference call, an analyst specifically questioned whether the success of Coventry's PFFS program and its high growth rate occurred as a result of under-pricing the market. Defendant Wolf responded that he had "a high degree of confidence in [the Company's] financial and actuarial teams who build [the program]."

68.    The following month, on March 15, 2007, Coventry issued a press release regarding its selection by the West Virginia Public Employees Insurance Agency as provider ot retiree benefits for the agency's 35,000 members. Days later, Defendant Guertin stated that Coventry would "exceed [Defendants'] expectations and probably just about anyone's expectations" on PFFS service with 135,000 members and new revenue exceeding $900 million for the year.

69.    On April 27, 2007, Coventry issued a press release announcing its financial results for the first quarter of 2007, ending March 31, 2007. In that press release, Coventry announced operating revenues of $2.24 billion and net earnings of $121.7 million. These results were repeated in the Company's Form 10-Q filed with the SEC on or about May 10, 2007, which

was signed by Defendants Wolf and Guertin.  According to the Form 10-Q, "[m]anaged care premium revenue increased as a result of growth in our Individual Consumer and Government Business division.  This growth is primarily a result of new membership from our new Medicare Private-Fee-For-Service products and additional members in both our Medicare Part D and Medicare Advantage Products."

70.     Coventry's Form 10-Q for the first quarter of 2007 contained forecasts for the Company's divisions.  Speaking of the Individual Consumer & Government division, the disclosure stated that Coventry's "new product for 2007, Private-Fee-For-Service, [was] off to a very robust start and [was] being offered in 43 states.  By year-end, [the Company was] expecting 135,000 new members and almost $1 billion of new revenue."  By contrast, the Commercial Division was expected to perform "flat with December 2006 results, to potentially down one percent," and the Specialty Division was expected to add a "small favorable effect on earnings this year" by its acquisition of Concentra's workers compensation business.

71.     Defendants  Wolf  and  Guertin  certified  that  the  disclosure  and  internal representations were appropriate in the Form 10-Q for the first quarter of 2007.

72.     On July 31, 2007, Coventry issued a press release announcing its financial results for the Company's second quarter of 2007 and the period ending June 30, 2007.  Coventry announced operating revenues of $2.33 billion and net earnings of $151.3 million or $0.96 per share.  In the press release, Defendant Wolf stated that he was "pleased to report another strong quarter from [Coventry's] well diversified portfolio of business," adding that the Commercial Business division had achieved an "outstanding medical loss ratio" and that the Individual Consumer & Government Business division showed "impressive growth."

73.     Coventry filed its Form 10-Q for the second quarter of 2007 on August 8, 2007. The 10-Q announced a "managed care premium revenue increase as a result of growth in [Coventry's] Individual Consumer & Government Business division."

74.     Once more, Coventry's Form 10-Q for the second quarter of 2007 included performance predictions for the Company's three divisions. The Form 10-Q stated:

> Commercial Division – we expect that on an organic basis the health plan ASO will be slightly down at year-end as compared to our June 30, 2007 membership and expect Commercial group risk membership in the aggregate will be slightly up at year-end as compared to our June 30, 2007 membership.
>
> Individual Consumer & Government Division – for our new product for 2007, Private-Fee-For-Service, we are expecting 150,000 members and more than $1 billion of revenue by year-end.
>
> Specialty Division – our acquisition of Concentra's workers compensation business April 2, 2007 is expected to have a small favorable effect on earnings this year.

75.     Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the Form 10-Q for the second quarter of 2007.

76.     On October 26, 2007, Coventry issued a press release announcing its financial results for the Company's third quarter of 2007 and the period ending September 30, 2007. Coventry announced operating revenues of $2.52 billion and net earnings of $168.7 million or $1.08 per share. In the press release, Defendant Wolf stated that he was "pleased to report another quarter of impressive top and bottom line growth from [Coventry's] well-diversified portfolio of business," adding that the Commercial Business division had achieved an "outstanding medical loss ratio" and that the Individual Consumer & Government Business division showed "impressive growth." Defendant Wolf went on to predict that the Company was

capable of growing "operating revenue by more than 25% in 2007 and approaching 30% in 2008."

77.     Coventry filed its Form 10-Q for the third quarter of 2007 on November 9, 2007. The Form 10-Q stated that "managed care premium revenue increased in both [Coventry's] Individual Consumer & Government Business divisions.  The growth resulted primarily from sales of new products. . . In 2007, [Coventry] began selling [the Company's] new PFFS products and [has] increased sales of [the Company's] individual product." The Form 10-Q further stated that "Government revenue increased for the quarter and nine months ended September 30, 2007 from the same periods in 2006 as a result of membership from [Coventry's] new Medicare PFFS business."

78.     On January 7, 2008, Coventry issued a news release signed by Defendant Guertin stating that the Company would reaffirm its publicly disclosed financial expectations for the quarter ended December 31, 2007 and full fiscal year 2008.  Specifically, the press release stated that at an upcoming investor conference on January 7 – 8, 2008, "Coventry intend[ed] to confirm the Company's ability to meet previously provided earnings expectations of $1.17 to $1.18 per diluted share for fourth quarter 2007 and $4.42 to $4.58 per diluted share for full year 2008."

79.     On February 8, 2008, Coventry issued a press release announcing its operating results for the fourth quarter of 2007 ended December 31, 2007.  Specifically, the Company reported:

> Operating revenues totaled $2.79 billion for the quarter with net earnings of $184.3 million, or $1.18 per diluted share, up from operating revenues of $1.94 billion and net earnings of $0.97 per diluted share in the prior year quarter. For the year ended December 31, 2007, total revenues were $9.88 billion, up 28% from the prior year, with net earnings of $626.1 million, or $3.98 per diluted share, up 15% from the prior year.

"Coventry's 2007 results were characterized by strong financial and operational performance, with the fourth quarter as no exception," said Dale B. Wolf, chief executive officer of Coventry. "Our 2007 organic growth initiatives and capital deployment activities have positioned us well for another year with industry-leading revenue growth and steady and reliable earnings results."

80.     Coventry filed its Form 10-K for the fourth quarter of 2007 and fiscal year on February 28, 2008.  The 2007 Form 10-K was signed by Defendants Wolf and Guertin and repeated the financial results for the fourth quarter of 2007 as well as the fiscal year 2007.

81.     Coventry's 2007 Form 10-K announced that, in comparison with 2006, "[m]anaged care premium revenue [in 2007] increased in both [Coventry's] Individual Consumer & Government and Commercial divisions. The growth is a result of [the Company's] new Medicare PFFS product."

82.     Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the Form 10-K for the fourth quarter of 2007 and fiscal year.

83.     Coventry issued a press release on March 17, 2008 reporting updates on the Company's 2008 guidance:

"after completing an analysis of financial results through February 2008 and a thorough review of each of the Company's lines of business, the Company expects full year GAAP earnings per share (EPS) on a diluted basis of $4.39 to $4.50, or growth of 10% to 13% from 2007. While still early in the year, the Company is pleased to report that all lines of business are performing well and that the underlying fundamentals continue to be sound."

84.     The March 17, 2008 press release also included additional updates, including an increase of consolidated revenues of $11.99 billion to $12.49 billion, consolidated MRR% of 79.9% to 80.3%, cost of sales expense of $160 million to $180 million, and GAAP earnings per share on a diluted basis of $4.39 to $4.50.

85.     Coventry issued a press release on April 25, 2008, announcing its financial results for the first quarter of 2008 and period ended March 31, 2008. The press release was signed by Defendant Guertin. The press release stated that "[o]perating revenues totaled $2.94 billion for the quarter with net earnings of $125.0 million, or $0.81 per diluted share." Furthermore, Defendant Wolf stated that "[c]onsistent with our comments in mid-March, we are pleased to confirm that our businesses continue to perform well and are fundamentally sound. . . We are on track for another year of industry leading revenue growth and remain very confident about our strategic positioning and growth prospects for the future."

86.     On May 12, 2008, Coventry filed its Form 10-Q for the first quarter of 2008 and the period ended March 31, 2008, repeating the financial results announced in its April 25, 2008 press release. According to the 2008 Form 10-Q for the first quarter, diluted earnings per share grew from 10% to 13% and the Individual Consumer & Government division was expected to have "another year of strong growth."

87.     Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the Form 10-Q for the first quarter of 2008.

**(iii)     The Truth About Coventry's Improper Business Practices Begins To Emerge**

88.     Coventry issued a press release on June 18, 2008 announcing that the Company had revised its 2008 outlook to reduce its earning per share estimates for the second quarter of 2008 and fiscal year 2008. Specifically, the press release announced:

> **- Medicare Advantage Medical Loss Ratio (MLR).** The Company expects the 2008 Medicare Advantage medical loss ratio to be between 85.5% and 85.9%, an increase of approximately 300 to 340 bps from the Company's prior estimate. The driver of this change is the Company's Medicare Advantage Private Fee-for-Service (PFFS) business. The Company has received a much higher than expected level of PFFS claims related to prior periods, which is inconsistent with claims submission patterns of network-

based Medicare Advantage products. As a result, the Company is projecting negative development of PFFS reserves related to 2007 of approximately $50.0 million. The Company is forecasting the overall Medicare Advantage MLR to be between 87.2% and 87.6% for the first half of 2008, inclusive of the negative development outlined above and a revised view on 2008 PFFS performance. The Company is forecasting the overall Medicare Advantage MLR to be between 84.0% to 85.0% for the second half of 2008. The higher than previously expected Medicare Advantage MLR has resulted in a reduction of $0.42 per diluted share to the midpoint of the Company's 2008 EPS guidance.

- **Commercial Group Risk MLR**. The commercial group risk MLR is being pressured by higher than expected levels of outpatient utilization and, to a lesser extent, a higher than expected inpatient unit cost trend caused by an increased severity level of facility claims. The Company's revised 2008 health plan commercial group risk MLR forecast is approximately 80.3% versus previous guidance of approximately 78.8%. Based upon estimates through May 2008, the Company expects the second quarter MLR to be in the range of 82.3% to 82.7% with the first half of 2008 MLR in the range of 80.6% to 80.8%. The second half of 2008 is expected to run at an MLR of approximately 80.0%. The Company has initiated forward pricing action to reflect the higher than expected trend. The higher than previously expected commercial group risk MLR has resulted in a reduction of $0.32 per diluted share to the midpoint of the Company's 2008 EPS guidance.

- **Other Modifications**. The Company is revising its revenue outlook from a midpoint of 23.9% growth over the prior year to a midpoint of 20.7%. The reduction in risk revenue guidance is primarily driven by the full year outlook on commercial group risk membership which is expected to be down by approximately 4.0% from prior year (although slightly up for the remainder of 2008 as compared to Q108), and an anticipation of Medicare Advantage membership growth in 2008 of approximately 90,000 members compared to a previous forecast for growth of 100,000 members. The decrease in management services revenue guidance is driven by a lower than expected level of bill volume in the Company's workers' compensation services business. Offsetting these decreases to the top-line are forecasted reductions in operating costs, including actions planned by the Company, and improvements in non-operating items. These modifications to operating items have resulted in a reduction to the midpoint of the Company's 2008 EPS guidance of $0.09 per diluted share which is

offset by the favorable $0.09 per diluted share impact of the non-operating changes to the Company's 2008 EPS guidance.

89.   In the press release, Defendant Wolf acknowledged that Coventry was "very disappointed with the April and May 2008 results and their anticipated effect on the second quarter and the full year."

90.   Following Coventry's announcement, the price of Coventry Stock sank over 22% from $40.00 per share to $31.39 per share on heavy trading volume.

91.   Coventry issued a press release on July 25, 2008 to announce the Company's financial results for the second quarter of 2008 and period ended June 30, 2008.   Coventry announced operated revenues of $2.98 billion and net earnings of $83.2 million or $0.55 per diluted share.

92.   On August 7, 2008, Coventry filed its Form 10-Q for the second quarter of 2008 and the period ended June 30, 2008, repeating the financial results announced in its June 25, 2008 press release.   According to the 2008 Form 10-Q for the second quarter, which was signed by Defendants Wolf and Guertin, Coventry described problems with the Company's PFFS initiative:

> Medicare Advantage risk premium yields, excluding the effect of revenue ceded to external parties, per member per month increased as a result of the rate increases from the annual competitive bid filings for our Medicare Advantage products as well as from increases in risk factor adjustment scores for our Medicare Advantage products. With the effect of the ceded revenue being included in the premium yield, the Medicare Advantage risk premium yields per member per month for the six month period ending June 30 decreased to $747.36 in 2008 from $802.97 in 2007. The decrease is a result of a larger portion of our Medicare PFFS business in 2008 being ceded to external parties through quota share arrangements…
>
> …

> The decrease in gross margin for the quarter ended June 30, 2008 was driven by increased medical costs associated with our Medicare PFFS business in 2008. This decrease is partially offset by higher gross margins for our Medicaid HMO and Individual businesses associated with the membership growth, both organic and acquired, as discussed above.

93.    Furthermore, the Form 10-Q for the second quarter of 2008 also disclosed that Coventry had been "notified of the termination of our Pennsylvania Medicaid behavioral health contract representing approximately 107,000 members, effective July 1, 2008."

94.    Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the Form 10-Q for the second quarter of 2008.

95.    Coventry issued a press release on October 21, 2008 to announce the Company's financial results for the third quarter of 2008 and period ended September 31, 2008. Coventry announced that "[o]perating revenues totaled $2.98 billion for the quarter with net earnings of $85.5 million, or $0.58 per diluted share, including charges related to investment impairments and realized losses of $36.2 million, or $0.15 per diluted share." Defendant Wolf responded by characterizing the Company's 2008 results as "unacceptable, and a great disappointment." Defendant Wolf, however, "ha[d] confidence in [the Company's] future prospects, both strategically and financially," claiming that Coventry had "identified and underst[ood] the issues that have affected [the Company's] results" and had "implemented a corrective action plan."

96.    Defendant Guertin, on a conference call with securities analysts, confirmed that Coventry had "identified the areas pressuring operating results this year and [had] implemented action plans to improve . . . performance." In relevant part, Defendant Guertin stated:

> Make no mistake here, we have identified the areas pressuring operating results this year, and have implemented action plans to improve our performance. What we cannot change here is the calendar, which impacts the timing of when we see the positive impacts of all of our actions, nor can we control the unprecedented

economic factors that seem to impact the landscape each and every day.

As you saw in the press release, upon observing higher than expected medical loss ratios on commercial in the third quarter, we once again tore apart each of our commercial health plans to get at the drivers of this pressure. Here we had the benefit of an additional quarter of completed data from 2008 for our analysis. There were four key conclusions that have emerged from this review; one, following the second quarter we believed the core medical trend in 2008 was 150 basis points higher than expected. The good news here is that the third quarter review showed that the core medical trends results were no worse than this. This is very important.

As you know, we implemented forward pricing action earlier this year assuming 150 basis points of elevated trend, and some additional margin for any further deterioration. This estimate still appears accurate, and as it pertains to the core medical trend we have not seen any further deterioration.

The second conclusion was that we were experiencing some additional MLR pressure that we tracked back to more subtle pricing and underwriting issues in two specific health plans. The nature of the issues we uncovered are not simple, easy to identify issues like "I wanted a certain price, and that price was cut". They have more to do with the interplay between underwriting risk assessment and pricing factors as well as some of the more detailed factors in the underwriting and pricing model itself.

The nature of most of these items is not that business that was written was unprofitable, rather it was less profitable than it had been historically and less profitable than what we assumed in our forecasts. The impact of these issues added 70 basis points to our outlook on full year commercial MLR. Needless to say, as a result of these reviews, all the changes needed to address these issues have been put in place as we speak today.

The third conclusion was that having a full year of Vista versus three plus months last year was having a bigger impact on the commercial MLR than we had previously thought. You will recall that our prior guidance assumed that the MLR in 2008 would be 50 basis points higher than 2007, due to this factor. An examination of updated experience for this year shows that this will be closer to 95 basis points or an increase of 45 basis points from our previous estimate. Let me be clear on this topic, this is still a very good and

important asset for the company, and I have every confidence in the team we have in place in south Florida. It is the nature of this business that this calendar year's results are largely a reflection of operating action taken prior to our ownership.

The final conclusion from this review was that we had seen significant MLR deterioration on our federal employee HMO business. This is not mail handlers, but rather the risk HMO business we're in out of each of our health plans. As you all know this business is what we refer to as slice where we are one of multiple options. It would appear at this point that we have experienced a significant degree of adverse selection in the most recent renewal cycle, which has caused the MLR deterioration in this block of business. The overall impact of this issue is an increase of 25 basis points from our previous MLR guidance. We have already set our participation in this program for 2009, and while we have made some changes to premiums and benefits, the jury is still out on what will happen to this block from both a membership and MLR perspective in 2009. But clearly, any ongoing result like this would warrant consideration of a different path for 2010.

Let me conclude my comments on the commercial business by reiterating that our fundamental outlook on trend for 2008 and 2009 is the same as a quarter ago, at 9% plus or minus 50 basis points. As you know, we decisively implemented forward pricing action earlier this year; in addition, this quarter we have made additional pricing changes on top of this to deal with the specific issues we found. All of our health plans are actively working on initiatives to improve medical expense trend outcomes in 2009. The biggest question in my mind today is not whether we will fix this issue, but all things being equal, how much of it will show up in 2009 before it fully shows up in 2010.

Let me start out on Medicare Private Fee for Service by clarifying what this is and isn't as it pertains to the third quarter developments. This is not an issue that has anything to do with any additional reserve development back to 2007, nor is it any issue with any internal claim payment practices. Those issues were identified and fully corrected in the second quarter. It is an issue about current year 2008 performance on this product. To no surprise, revenue per member in 2008 is largely as expected. The problem, therefore, is being driven on the medical expense side and in particular on our individual products as opposed to our group products.

We are experiencing trends in 2008 of around 9% on the individual business versus a comparable expected trend in the 5% range. You will recall that on this product we pay Medicare rates to providers, so with the exception of the implementation of MS-DRGs in the fourth quarter of 2007, the variances from expected results are largely driven by higher than expected utilization, with the biggest variance being observed in the outpatient category. Looking deeper into this, we can also see that one of our particular individual plan offerings is the real culprit here. In essence our individual membership is primarily distributed across three plans; one is a richer premium bearing product, while the other two are leaner plan designs with zero premiums.

In 2008 this richer premium bearing product is running a loss ratio in the mid to upper 90s, while the zero premium products are running in the mid to upper 80s. In our 2009 bids we have made some meaningful redesigns of this particular product in terms of where it is offered, the benefit plan design, and the corresponding premiums. The ultimate impact of these specific changes, as well as the refinement of our view on 2009 performance of Private Fee for Service in total, will clearly be front and center over the next couple of months.

97.     Following the October 21, 2008 announcements, the price of Coventry Stock fell from $28.49 per share to $13.93, a decline of over 51% on high trading volume.

98.     The Company repeated its financial results for the second quarter of 2008 in its Form 10-Q, filed with the SEC on November 7, 2008. Defendants Wolf and Guertin certified that the disclosure and internal control representations were appropriate in the Form 10-Q for the third quarter of 2008.

99.     The foregoing statements by Defendants were materially false and misleading when made because the statements misrepresented or failed to disclose certain adverse facts which were known to Defendants or recklessly disregarded by them:

a.   that the Company perpetuated a comprehensive under-pricing strategy in its PFFS initiative designed to create the appearance that this new program was

capable of achieving the high growth necessary to offset the deteriorating

business in Coventry's Commercial Business division;

b.  that Coventry failed to disclose the true risks associated with these under-

pricing strategies, including that new PFFS memberships created by this

strategy came at the expense of profitability;

c.  that the improper claims assumptions that materially understated Coventry's

health care claim expenses masked the true negative effects of Coventry's

under-pricing strategies;

d.  that Coventry's disclosure and internal controls representations were false and

misleading, as were Defendant Wolf and Guertin's certifications thereon;

e.  that as a result of the foregoing allegations, Defendants possessed no

reasonable basis for their positive statements about Coventry, the Company's

prospects or its earning guidance during the Class Period.

100.    Because of the foregoing false and misleading statements and material

misrepresentations of fact by Defendants, Coventry Stock traded at artificially inflated prices.

Plaintiff and Plan participants who acquired or purchased Coventry Stock as a retirement asset in

the Plan have been damaged as a result of Defendants' material misrepresentations and

omissions.

**B.    Defendants Knew Or Should Have Known That Coventry Stock Was An Imprudent Investment Option For Plan Assets**

101.    During the Class Period, although they knew or should have known that the

Company's Stock was an imprudent investment for the Plan's assets, Defendants failed properly

discharge their fiduciary duty to adequately protect the heavy investment of the Plan's retirement

assets in Coventry Stock.  As discussed in the foregoing paragraphs, Company Stock was an

imprudent investment option because of Defendants' material misrepresentations and omissions with regard to Coventry's business practices, financial results, investment guidance and outlooks, leading to an artificial inflation of the price of Coventry Stock.

102.    As a result of the enormous erosion of the value of Company Stock, Plan participants, the retirement savings of whom were heavily invested in Coventry Stock, suffered unnecessary and unacceptable losses.

103.    Because of their high ranking positions within the Company and/or their status as fiduciaries of the Plan, Defendants knew or should have known of the existence of the above-mentioned problems.

104.    Defendants knew or should have known that, due to the Company's improper under-pricing strategy employed with regard to Coventry's PFFS product and the material misrepresentations or omissions made with regard to the Company's business practices, the price of Company Stock was artificially inflated and would suffer once the Company's true financial condition came to light, thereby devastating Plan participants' retirement savings once the truth became known.  Yet, Defendants failed to protect the Plan and its participants from foreseeable losses.

105.    Rather, during the Class Period, despite its obligation to prudently manage the Plan's assets—including the Plan's heavy investment in Coventry Stock—the Company misrepresented its true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company Stock.

106.    As a result of Defendants' knowledge of the public misstatements and omissions regarding Coventry's actual financial state, any generalized or unspecific warnings made by Defendants to Plaintiff or Class Members regarding the suitability of investment in Coventry

Stock did not effectively inform Plaintiff or Class Members of the past, immediate and future dangers of investing Plan assets in Company Stock.

107. A reasonable fiduciary would have discovered—after an adequate or even cursory investigation—that under the circumstances, investment of Plan assets in Coventry Stock during the Class Period was excessively and unduly risky and thus imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect Plan participants against unnecessary losses and would have made different investment decisions.

108. Defendants failed to conduct an appropriate investigation into whether Coventry Stock was a prudent investment for the Plan and failed to provide Plan participants with adequate and accurate information regarding the Company's problems so that participants could make informed decisions regarding their investments in the Plan.

109. Defendants also failed to account for the changing risk profile of investment in Coventry Stock as a result of the above-described circumstances and Coventry's deteriorating financial performance as demonstrated by objective indicators.

110. Because Defendants knew or should have known that Company Stock was not a prudent investment option for Plan assets, they had a fiduciary duty to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company Stock.

111. Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plan of Coventry Stock; discontinuing further contributions to and/or investment in Coventry Stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries

of the Plan to the extent that as a result of their employment by Coventry they could not loyally serve the Plan and its Participants in connection with the Plan's acquisition and holding of Coventry Stock.

112.    Despite the availability of these and other options, Defendants failed to take any action to protect Participants from losses resulting from the Plan's investment in Coventry Stock. In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Company Stock even as Coventry's problems came to light.

113.    Furthermore, Defendants failed to adequately review the performance of other Plan fiduciaries to ensure that they were fulfilling those duties under the Plan and ERISA.

## C.    Defendants Failed To Provide Plan Participants With Complete And Accurate Information About The Risks Of Investing Plan Assets In Coventry Stock

114.    ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plans and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent - especially when that misunderstanding was fostered by fiduciary's own material representations or omissions."); *Jones v. Am. Gen. Life & Accident Ins. Co.*, 370 F.3d 1065, 1072 (11th Cir. 2004).

115.    During the Class Period, upon information and belief, certain Defendants made direct and indirect communications with the Plan's participants including statements regarding investments in Company Stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including SPDs and Prospectuses regarding Plan/participant holdings of Company Stock), which included and/or reiterated these statements.  At all times during the Class Period, Coventry's SEC filings were incorporated into and part of the SPDs, the Prospectus and/or the Form S-8 registration statements.

116.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that: (a) employees tend to interpret a match in company stock as an endorsement of the company and its stock; (b) out of loyalty, employees tend to invest in company stock; (c) employees tend to over-extrapolate from recent returns; (d) expecting high returns to continue or increase going forward; (e) employees tend not to change their investment option allocations in the plan once made; (f) no qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely; (g) lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and (h) even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

117.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's assets in Company Stock, they still took no action to protect the Plan's assets from their imprudent investment in Company Stock.

**D.      Defendants Suffered From Conflicts Of Interest**

118.    ERISA also mandates that Defendants, as fiduciaries of the Plan, are required to manage the Plan's assets, including investments in Company Stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries.  Defendants are obligated by this duty of loyalty to avoid conflicts of interest and to promptly resolve conflicts when they occur.

119.    Conflicts of interest put certain of Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests the Defendants were obligated to loyally serve with an "eye single" to the Plan.  *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003) ("When administering or managing a plan, a fiduciary must act solely in the interest of beneficiaries."); *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361, 1369-70 (N.D. Ga. 2004) (same). When a company that invests excessive amounts of plan assets in Company stock experiences a deteriorating financial situation, such conflicts of interests are created.

120.    Furthermore, courts have mandated that "[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions."  *Martin v. Feilin*, 965 F.2d 660, 670 (8th Cir. 1992).  Fiduciaries have a duty to avoid "placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as a trustee of the pension plan."  *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

121.    Defendants have breached the above-described fiduciary duty by choosing to act in the interest of the Company over those of the Plan by failing to conduct a careful and impartial investigation as to whether to take appropriate action to protect the Plan.  Defendants continued

to offer Coventry Stock as an investment for Plan assets, make matching contributions in Company Stock and maintain Company Stock investments in the Plan.

122.    Further indicative of Defendants' conflicts of interest, Defendants and Company insiders sold more than 800,000 shares of personal holdings in Coventry Stock, valued in excess of $46 million, thereby protecting their own financial interests. Yet, Defendants did nothing to protect the Plan and its participants from the invariable losses the Plan would suffer as the Company's problems continued, the value of Company stock steadily slid and the news regarding the Company's problems finally came to light.

123.    As a result of these conflicts of interest and Defendants' breach of their fiduciary duties, the Plan suffered a loss of tens of millions of dollars as the value of Company Stock plummeted.

## E.    The Relevant Law

124.    ERISA § 502(a)(2), 29 U.S.C. § 1 132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan participant for relief under ERISA § 409, 29 U.S.C. § 1109.

125.    An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary. See U.S.C. § 1002(21)(A).

126.    When fiduciaries put the interests of the company or their own interests ahead of the interests of plan participants, they violate ERISA. A fiduciary may, therefore, be personally liable to plan participants for breaching the responsibilities, obligations, or duties imposed under the plan and must restore any losses to the plan with any profits the fiduciary made through use of plan assets. ERISA § 409(a), 29 U.S.C. § 1109(a).

127.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from fiduciaries, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

128.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1 104(a)(1)(A) & (B), provide, in pertinent part, that a fiduciary shall discharge duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

129.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence.

130.    Withholding information that the fiduciary knows or should know participants need to make informed choices is a breach of the duty of loyalty.  A fiduciary has the duty to disclose and inform which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

131.    A plan fiduciary is also responsible for the selection and monitoring of plan investments, including in this instance the Sallie Mae Stock Fund, which invested in Sallie Mae stock, ensuring that only prudent investments are offered as plan options, and monitoring such investments to ensure that they remain prudent and suitable for the plan.  This includes the duty to conduct an independent and thorough investigation into, and to continually monitor, the merits

of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan.

132.    A fiduciary must avoid conflicts of interest and resolve them promptly when they do occur.  As such, a plan fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

133.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

    (i)    In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

    (ii)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

    (iii)    if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

    (iv)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

134.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of a fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given decision, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit

their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary did not participate in a breach, if he knows of a breach, he must take steps to remedy it:

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

135. Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## CAUSATION

136. The Plan suffered hundreds of millions of dollars in losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Coventry stock during the Class Period, in breach of Defendants' fiduciary duties.

137. Defendants are liable for the Plan's losses in this case because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder. Defendants withheld material, non-

public information from the Plan's participants, and provided inaccurate and incomplete information to them regarding the true financial health and ongoing profitability of Coventry, and its soundness as an investment vehicle. As a consequence, participants could not exercise independent control over their investments in the Coventry Stock, and Defendants remain liable under ERISA for losses caused by such investments.

138. Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Coventry Stock, eliminating Coventry Stock as an investment alternative when it became imprudent, and divesting the Plan of Coventry Stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, the participants suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

139. Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the assets of the Plan should not have been invested in Company Stock during the Class Period.

140. As a consequence of Defendants' breaches, the Plan suffered significant losses.

141. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "my person who is a fiduciary...who breaches any of the...duties imposed upon fiduciaries...to make good to such plan any losses to the plan..." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate..."

142. With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made

or maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the assets of the Plan in the most profitable alternative investment available to them. In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

143.     Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and interests on these amounts, as provided by law; and (5) such other legal or equitable relief as may be just and proper.

144.     Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plan, and indirectly, the Plan's participants in this case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.     A Declaration that this action to be a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure;

B.     A Declaration that Defendants, together and individually, breached their fiduciary duties under ERISA to Plaintiff and members of the Class;

C.    A Declaration that Defendants, together and individually, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    An Order compelling Defendants to reimburse the Plan for all losses thereto, resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the assets of the Plan, and to restore to the Plan all profits Defendants made through the use of the assets of the Plan, and to restore to the Plan all investment profits that Plaintiff and member of the Class would have made if Defendants had fulfilled their fiduciary obligations;

E.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duty;

F.    An Order for equitable restitution and appropriate equitable and injunctive relief against Defendants, together and individually, including appropriate modifications to the Plan to ensure against any further violations of their fiduciary duties under ERISA;

G.    An award of actual damages in the amount of any losses the Plan suffered, to be allocated among the individual accounts of Plaintiff and members of the Class in proportion to the losses of those accounts;

H.    An award to Plaintiff and members of the Class damages as a result of the wrongs complained of herein, with pre-judgment and post-judgment interest;

I.    An award to Plaintiff and members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      An award to Plaintiff and members of the Class such other and further relief as

the Court may deem just and proper.

Dated: <u>February 25, 2010</u>                          **TYDINGS & ROSENBERG LLP**

By: _____

John B. Isbister, Fed. Bar No. 00639
Toyja E. Kelley, Fed. Bar No. 26949
100 East Pratt Street
Baltimore, MD 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460
E-mail: jisbister@tydingslaw.com
E-mail: tkelley@tydingslaw.com

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr.
32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553

***Counsel for Plaintiff***